UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LUIS MEDINA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-10615-NMG |
| | ) | |
| GARY RODEN, | ) | |
| | ) | |
| Respondent. | ) | |

REPORT AND RECOMMENDATION ON
PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

July 2, 2012

SOROKIN, C.M.J.

Pending is the Petition for Writ of Habeas Corpus (Docket No. 1) of the Petitioner, Luis Medina ("Medina"). For the following reasons, I RECOMMEND that the Court DENY the Petition.

I.   FACTUAL AND PROCEDURAL BACKGROUND

   A.   The Facts

Neither of the state appellate decisions in this case provide a comprehensive summary of the facts underlying Medina's habeas petition. See Supplemental Answer Tab 11, Commonwealth v. Medina, No. 08-P-1040 (Mass. App. Ct. 2010); Supplemental Answer Tab 8, Commonwealth v. Medina, 74 Mass.App.Ct. 1120, 909 N.E.2d 59 (2009) (unpublished table

1

decision). The factual summary that follows derives primarily from the trial transcript. Throughout its legal analysis, however, the Massachusetts Court of Appeals ("Appeals Court") did reach some factual determinations. On collateral review, those determinations are presumed to be correct, see 28 U.S.C. § 2254(e)(1), and incorporated into the following summary accordingly.

In July of 2003, Medina became the focus of a drug trafficking investigation. Supplemental Answer Tab 15, Transcript ("Tr.") at 20-21. A series of telephone calls led a team of local, state, and federal law enforcement officers to surveil an apartment in Springfield, Massachusetts beginning on July 30, 2003. Id. at 21-22. At about 1:00 a.m. on July 31, 2003, the surveillance team observed Medina arrive at the apartment in a green minivan. Id. at 85-86, 100. The team terminated surveillance around 2:00 or 3:00 a.m. Id. at 87.

Later that same morning, surveillance of the apartment resumed. Id. at 23, 101. The surveillance team also began monitoring an intersection in Holyoke, where it expected Medina to deliver a large quantity of cocaine. Id. at 24-25, 88. At around 9:00 a.m., Medina arrived in a green minivan. Id. at 88. After he parked on a corner of the intersection, the officers converged on the minivan, and Medina exited it. Id. at 26-27. An officer began patting him down, at which point Medina stated that he only had "28."[1] Id. at 28-29. The officer interpreted his remark to mean that he had 28 grams of cocaine. Id. at 29. A different officer subsequently recovered a

---

[1] Whether Medina made this initial statement in English or Spanish is unclear from the record. The arresting officers provided inconsistent testimony on this point. Compare Tr. at 30 (Spanish) with id. at 89 (English). The habeas briefs likewise contrast, with Medina stating that he spoke English, Docket No. 19, at 2, and the respondent stating that he spoke Spanish. Docket No. 20, at 4. Because Medina and one of the arresting officers spoke both languages, Tr. at 30, 42-43, this discrepancy is immaterial. The record is clear that the statements he gave following his arrest were in English. Id. at 42, 68.

plastic bag of white powder from the minivan. Id. at 29, 89. A drug certificate from the state crime laboratory states that the bag contained 28.14 grams of cocaine. Id. at 90-92.

After discovering the cocaine, the officers arrested Medina and transported him to the police station. Id. at 30. The arrest occurred within 950 feet of a junior high school. Id. at 50-51, 148-49. On the way to the station, an officer advised Medina of his Miranda rights. Id. at 31- 32. At the station, Medina informed the officers that he wanted to cooperate. Id. at 33. The officers then provided additional Miranda warnings. Id. at 36-37. Medina signed a form that indicated that he understood his rights. Id. at 37-38. He also signed a form that authorized the officers to search the apartment in Springfield. Id. at 45-46, 73.

The officers obtained a statement from Medina next. Id. at 41-42. One officer typed the statement into a word processor, as Medina provided it orally. Id. at 43, 66-67. In this first statement, Medina revealed that a contact, Carmen, called him on July 30th and asked for five hundred grams of cocaine. Id. at 71. He was in Bronx, New York when she called. Id. Because he "couldn't find 500 [grams] in New York," Medina explained that he "only brought 28 grams." Id. at 72. He also explained that "I already told one of the cops that I had 28 grams on me and it was in the trunk of my car." Id. In the statement, Medina provided details about his financial dealings with his supplier in New York, including the mark-up on the cocaine that he sells to Carmen. Id.

As Medina gave his first statement, several officers searched the Springfield apartment. Id. at 73-74, 104-05. The officers uncovered additional bags of cocaine and a mask, a scale, and lactose – all items used in the packaging of cocaine. Id. at 113-16, 119-21. A ledger containing notations about different quantities of cocaine was also uncovered. Id. at 128-29. The apartment

is within 848 feet of a school.  Id. at 140-41, 149-50.

When informed that the officers had uncovered cocaine at the apartment, Medina gave a second statement, in which he denied ownership of the drugs.  Id. 74, 77.

> Trooper Josyln just told me that the officers found 400 grams of powder and 40 grams of crack in my apartment.  Those drugs aren't mine.  I was making a delivery for my supplier. . . . I picked this stuff up last night.  I brought it here in the glove compartment.  There are 470 grams.  About 27 grams were cooked and the rest was powder.  I took the 28 grams for Carmen from that stuff.  The reason I only brought her the 28 grams and not all of it is because I knew something was strange, and that's why I left the rest at the apartment.

Id. at 77-78.  Drug certificates from the state crime laboratory confirm that the bags recovered at the apartment contained various concentrations of cocaine.  One sample weighed 324.84 grams and another weighed 77.21 grams.  Id. at 109-10.  A third sample weighed 46.60 grams.  Id. at 110.  The certificate for this sample noted that it was freebase cocaine, which is commonly known as crack.  Id.

Through his statements to the officers, Medina "provided a precise (and accurate) measure of how much cocaine was present in each location."  Medina, No. 08-P-1040, at 2.  Altogether, from both the apartment and minivan, the officers seized 476.79 grams of cocaine according to the drug certificates.  See Tr. at 90-92 (28.14 grams in the minivan), 109-10 (324.84, 77.21, and 46.60 grams in the apartment[2]).  Medina admitted in his second statement

---

[2]  The Appeals Court miscalculated the amount of cocaine seized from the apartment.  Medina, No. 08-P-1040, at 1-2 n.1.  The state crime laboratory certified three different samples of drugs seized there.  Tr. 109-10.  By adding the amount of cocaine in each sample together, the Appeals Court determined that the officers seized 466.65 grams of cocaine.  Medina, No. 08-P-1040, at 1-2 n.1.  The sum of the three samples is not 466.65 grams.  Rather, these three samples total 448.65 grams.  If the fourth sample that the officers seized from the minivan is added to this amount, the total reaches 476.79 grams.  Id. at 90-92.  This amount is only 6.79 grams more

4

that he brought 470 grams up from New York.  Id. at 77.  Medina likewise stated, at the scene of his arrest and in his first statement, that he had 28 grams of cocaine in his minivan.  Id. at 28-29, 72.  The cocaine recovered from his minivan weighed 28.14 grams.  Id. at 90-92.  The statements thus provide "evidence – apart from the . . . drug certificates – of both the nature and weight of the substances seized."  Medina, No. 08-P-1040, at 2-3 n.2.  Medina's first and second statements also "reveal that he was familiar with the process of buying and selling cocaine, as he provided a detailed account of how he obtained [it]" from his supplier in New York.  Id. at 3.

While providing the statements, Medina was relaxed and cooperative. Tr. at 48, 66.  He had no apparent difficulty communicating with the officers.  Id. at 65.  He did not appear to be under the influence of drugs or alcohol.  Id. at 48, 65.  The officers told him that they would inform the prosecutors of his cooperation.  Id. at 49, 75.

B.     State Court Proceedings

Before his trial, Medina filed a motion in Hampden County Superior Court to suppress the statements that he made at the scene of his arrest and the police station.  Supplemental Answer Tab 14, at 70-74.  The court denied this motion.  Id. at 74.  Medina also moved to suppress the evidence seized at the apartment.  Id. at 6-7.  The court refused to hear this motion, as he had no privacy interest in the apartment.  Id. at 8-9.  The case then proceeded to trial.  Id. at 74-76.

At trial, defense counsel objected to the admission of the statements that Medina made at the police station.  Tr. at 70-73, 76-78.  The court overruled these objections and admitted the statements as exhibits.  Id.  The statements were also read to the jury.  Id.  When the prosecutor

---

than the 470 grams that Medina stated he brought to Massachusetts.  Id. at 77.

asked one of the officers about Medina's statement that he only had "28," defense counsel did not object. Id. at 28-29. Defense counsel did object when the prosecutor asked the officer to explain its significance. Id. The court overruled this objection. Id. The court also admitted the four drug certificates over defense counsel's objection. Id. at 90-92, 109-10. The prosecutor introduced the certificates through one of the officers that conducted the investigation. Id. at 84, 92, 109-10. No chemist from the state crime laboratory testified at trial. See id. at 18-155.

Once in evidence, "[t]he prosecutor did not reference [any of the drug certificates] again, even in closing."[3] Medina, No. 08-P-1040, at 3. His closing instead focused on Medina's statements to the officers, as well as the packaging equipment found in the apartment. Tr. at 170-172.

> But you look at what Mr. Medina did with law enforcement [on the day of his arrest]. Mr. Medina gave two separate statements. In those statements, he acknowledges, confesses that he came from New York City with that quantity of cocaine to deliver to another person or persons. He brought into the Commonwealth of Massachusetts, ladies and gentlemen, by his own words, an amount of cocaine in excess of 28 grams and 200 grams. Twenty-eight grams came in with him from New York City and the other stuff in the apartment came up from New York City as well.

Id. at 172. In closing, defense counsel did address the certificates, questioning whether they referenced the correct bags and were properly notarized. Id. at 164-65. After closing arguments, the court instructed the jury that it may consider the drug certificates "in determining whether the substance claimed to be cocaine is cocaine" and "whether the amount of cocaine

---

[3] In closing, the prosecutor did allude to the drug certificate for the 28.14 grams of cocaine found in the minivan, explaining that Medina "told the officers, [a]ll I got is 28 in the back. Low and behold, what the officers recovered from the back of the van is a little over 28 grams of cocaine." The drug certificate permitted the prosecutor to state, conclusively, that the officers recovered "a little over 28 grams of cocaine."

6

claimed is the amount of cocaine claimed." Id. at 193.

A jury found Medina guilty of two counts of trafficking in cocaine (28 to 100 grams and 200 grams or more) and two counts of committing these offenses within a school zone. Id. at 211-15. Medina appealed his convictions to the Appeals Court, which affirmed them on June 25, 2009. Medina, 74 Mass.App.Ct. at 1. Medina then filed an Application for Leave to Obtain Further Appellate Review ("ALOFAR"), in which he raised three grounds: (1) that the Appeals Court erred in affirming his convictions where he was denied his Sixth Amendment right to confront and cross-examine all of the evidence against him; (2) that the Appeals Court erred in affirming the motion judge's refusal to hear his motion to suppress seized from the apartment; and (3) that the Appeals Court erred in affirming his convictions where the trial judge erroneously refused to give a DiGiambattista instruction. Supplemental Answer Tab 9, at 6-14.

The Massachusetts Supreme Judicial Court ("SJC") denied the application without prejudice and remanded the case to the Appeals Court to consider in light of the SJC's cases on harmless error for violations of Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). Supplemental Tab 10, Commonwealth v. Medina, 457 Mass. 1106, 929 N.E.2d 971 (2010). On reconsideration, the Appeals Court affirmed the convictions. Medina, No. 08-P-1040, at 1, 4. Although the admission of the drug certificates violated Medina's confrontation rights, the Appeals Court ruled that this trial error was harmless beyond a reasonable doubt. Id. at 2-4. The Appeals Court reasoned that the statements that Medina made regarding the amount of cocaine in the minivan and in the apartment nullified the effect of the certificates. Id. at 2-3. Medina filed a second ALOFAR, which the SJC denied on December 2, 2010. Supplemental Answer Tab 13. The second ALOFAR made a single claim: that the Appeals Court erred in concluding

that the denial of Medina's Sixth Amendment confrontation rights was harmless beyond a reasonable doubt. Supplemental Answer Tab 12, at 5-19.

C. Federal Habeas Proceedings

On April 11, 2011, Medina filed a petition for a writ of habeas corpus with this court. Docket No. 1. In section 12 of the petition, he alleged that the state criminal proceedings against him violated his federal constitutional rights by: (A) admitting drug certificates into evidence without the testimony of the chemist who tested the drugs; (B) declining to suppress evidence that police seized from an apartment where he was staying; (C) refusing to give a Digiambattista instruction to the jury; and (D) admitting statements that he made to the police under coercion into evidence. Id. at 4-5a. The respondent moved to dismiss the petition because it contained exhausted and unexhausted claims. Docket No. 10. In his opposition, Medina agreed to withdraw any claim that this court deemed unexhausted. Docket No. 14, at 9. On December 6, 2011, this court issued a report and recommendation that determined that three of the four claims were unexhausted. Docket No. 15, at 7. The report and recommendation deemed these three claims withdrawn and, as to claim 12A only (the Melendez-Diaz claim), recommended that the court deny the respondent's motion to dismiss. Id. The district court subsequently adopted this report and recommendation. Docket No. 17. The petition before this court now is therefore limited to the Melendez-Diaz claim only.

II. DISCUSSION

There is no dispute that the admission of the four drug certificates violated Medina's confrontation rights under the Sixth Amendment of the United States Constitution. See Docket No. 19, at 6; Docket No. 20, at 8; Medina, No. 08-P-1040, at 1-2. Following Melendez-Diaz v.

8

Massachusetts, such certificates are testimonial evidence, and the chemists that produce them must be subject to cross-examination. E.g., Likely v. Ruane, 642 F.3d 99, 101 (1st Cir. 2011). Medina and the respondent instead dispute the effect that this constitutional error had on the jury's verdict. The prosecution established the information contained in the certificates – the weight and composition of the substances seized – through statements that Medina made to the officers. This independent, powerful evidence prevents the admission of the certificates from casting sufficient doubt on the integrity of the verdict to warrant habeas relief.

    A.    Habeas Corpus Standard of Review

A habeas petition premised on a federal constitutional error during a state court trial cannot survive a motion to dismiss unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Sinnott v. Duval, 139 F.3d 12, 14-15 (1st Cir. 1998) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)). Despite the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA") in 1996, habeas courts continue to apply this test if a constitutional error is found. Fry v. Pliler, 551 U.S. 112, 120 (2007). The AEDPA introduced a deferential test that layers "[t]he habeas question of whether the state court decision is objectively unreasonable . . . on top of the underlying standard governing the constitutional right asserted." Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001). Because the harmless-beyond-a-reasonable-doubt test from Chapman v. California, 386 U.S. 18, 23-24 (1967) governs confrontation clause violations on appeal, the AEDPA test is whether a state court's harmless-beyond-a- reasonable-doubt determination was reasonable. Sinnott, 139 F.3d at 14-15. In Fry v. Pliler, however, the Supreme Court made it clear that habeas courts need only apply the test enunciated in Brecht v. Abrahamsom.

9

> Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, it is implausible that, without saying so, AEDPA replaced the Brecht standard of "actual prejudice," with the more liberal AEDPA/Chapman standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former.

Fry, 551 U.S. at 119-20 (internal citations and quotations omitted).

"[A] straightforward harmless error analysis under Brecht" is all that is necessary here. Foxworth v. St. Amand, 570 F.3d 414, 435 (1st Cir. 2009). For an error to have had a "substantial and injurious effect," it must be "of such magnitude that it actually casts doubt on the integrity of the verdict." Gilday v. Callahan, 59 F.3d 257, 269 (1st Cir. 1995). This stringent test recognizes that the "writ of habeas corpus has historically been regarded as an extraordinary remedy," which is only available to "persons whom society has grievously wronged." Brecht, 507 U.S. at 633-34 (internal quotations omitted). "[I]f a judge has 'grave doubt' about whether an error [caused a substantial and injurious effect], the judge must treat the error as if it did so." O'Neal v. McAninch, 513 U.S. 432, 438 (1995).

When reviewing confrontation clause violations for harmless error under Brecht, habeas courts consider "(1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." DiBenedetto v. Hall, 176 F.Supp.2d 45, 55-56 (D.Mass. 2000) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)) (numerals added).

B.     Harmless Error

The admission of the four drug certificates had no substantial and injurious effect on the jury's verdict in this case. At the scene of his arrest and the police station, Medina admitted that he had 28 grams of cocaine in the minivan. In his second statement at the station, Medina admitted that he brought 470 grams of cocaine up from New York. Independent of the certificates, these statements provide strong evidence of both the composition and weight of the substances seized. Medina presented no evidence at trial that contradicted his statements and the certificates. This is not a case where, absent the improperly admitted evidence, the prosecution's case was thin. See Foxworth, 570 F.3d at 436 (admitting statement by co-defendant that placed the habeas petitioner at "the murder scene, armed, and with a motive" was not harmless error, as shaky eyewitness identification was only other evidence that he was the shooter). Rather, the prosecution here could point to Medina's own words as powerful evidence of the composition and weight of the substance seized. Sinnott, 139 F.3d at 19-21 (finding harmless error where other eyewitness and medical testimony paralleled version provided in improperly admitted statement by co-defendant with credibility issues).

Medina attempts to undercut his statements to the officers by arguing that the prosecution laid an insufficient foundation for crediting them. Document 19, at 10-12. In these very statements, however, Medina reveals that he is familiar with the cocaine trafficking business, including how cocaine is obtained and how much it is marked-up. Medina, No. 08-P-1040, at 3. The scale, mask, lactose, and ledger recovered from the apartment further suggest that he was actively dealing cocaine. Tr. at 113-16, 119-21. There is thus a sufficient basis for crediting his admission that the officers seized cocaine from the minivan and apartment. The scale and the

11

ledger, with its notations about cocaine quantities, further suggest that his admissions regarding the weight of the cocaine should likewise be credited. Even without this corroborating evidence, the integrity of the verdict against Medina is not in question. Considering this evidence leaves no doubt as to the legality of the Appeal Court's decision. See Razo v. Thomas, 700 F.Supp.2d 1252, 1266 (D.Haw. 2010) (finding no substantial and injurious effect because petitioner admitted at trial that he possessed more than one-eighth an ounce of methamphetamine).[4]

Medina also argues that the state appellate courts in Massachusetts apply Melendez-Diaz unequally and thus unreasonably. Document 19, at 17-18. In support of this theory, he asserts that his case is one of only a handful in which those courts found the Melendez-Diaz error harmless. Id. at 12-18. The record in this case supports the state court's decision under the applicable federal standard, i.e., whether the drug certificates caused a substantial and injurious effect. Fry, 551 U.S. at 120. They did not.

---

[4] The prosecution was required to prove that Medina trafficked 200 grams of cocaine or more. Tr. 198. The evidence comfortably establishes this amount. See id. at 77 (stating that he brought 470 grams up from New York). The other trafficking offense required proof that Medina trafficked 28 grams or more. Id. at 197. In this proceeding, the prosecution's reliance on Medina's statement that he had 28 grams in the minivan, coupled with his facility with the weights, the scale in the apartment, and his arrest shortly after leaving the apartment, suffices. Id. at 28-29, 71-73, 121.

III.   CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY the Petitioner's Petition for Writ of Habeas Corpus.[5]

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　/s/ Leo T. Sorokin
　　　　　　　　　　　　　　　　　　Leo T. Sorokin
　　　　　　　　　　　　　　　　　　Chief United States Magistrate Judge

---

[5] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).